FREDERICK A. SCHMIDT, INC., APPELLEE, *v.* INSTITUTUM DIVI THOMAE FOUNDATION, APPELLANT.[*]

(No. 8442—Decided July 21, 1958.)

*Messrs. Dolle, O'Donnell, Cash, Fee & Hahn,* for appellee.
*Messrs. Gould & Spiegel,* for appellant.

MATTHEWS, J.  This is an appeal from a judgment for the plaintiff for $6,942.50, representing a commission of 5 per cent upon an offer to purchase the site of Rookwood Pottery, which the plaintiff alleged it had obtained as the duly authorized agent of the defendant-owner.  Trial by jury was waived, and during the trial to the judge sitting as the trier of the facts, the defendant duly requested that the court state, in writing, the findings of fact found separately from the conclusion of law. Accordingly, the court made a separate finding.  The plaintiff requested the court to amend its findings in 13 specific respects. Responding thereto, the court did make seven additional findings of fact.  The conclusion of law was that the plaintiff was

[*]Motion to certify record overruled, December 24, 1958.

entitled to recover, and a judgment was entered, as stated previously. The defendant appealed on questions of law to this court, and has presented a complete record containing all the evidence introduced at the trial, and upon which the findings of fact are based. We are, therefore, in a position to determine what facts were in dispute, and to interpret the findings in the light of all the evidence, and determine the extent to which the findings are supported by the evidence.

The petition sets forth the ordinary case of a real estate owner employing a real estate broker to find a purchaser ready, willing, and able to buy the property for $125,000, and the answer is a general denial. The burden of proof was upon the plaintiff to show that it had the unqualified authority to find a purchaser who submitted a binding offer to buy on the terms dictated previously by the owner to the agent; and, that, as between it and the defendant, the latter thereupon became bound to pay a commission as though the transaction had culminated in an actual transfer of the property.

The record shows that the defendant owned the real estate upon Mt. Adams, in Cincinnati, Ohio, on which Rookwood Pottery is located, and it was operating the pottery in a part of the building. This property was contiguous to the Mt. Adams Incline Plane property just recently acquired by Gerson and Kuhr.

The defendant was desirous of selling the Rookwood real estate under some arrangement whereby the Pottery factory operation could be continued by a closely related corporation, to be later organized, and that was made a condition of the sale in all of defendant's negotiations. In pursuance of this objective, the defendant, through Dr. George Sperti, its duly authorized agent, was brought in communication with McConnell & Smith, and, as a result of their negotiations, the defendant had agreed to sell the Rookwood real estate to them for $100,000, with provision for the continuance of the operation of the pottery on a part of the premises for a limited period, supplemented with an irrevocable offer to purchase the pottery assets on or before December 31, 1957. However, no definite contract had been entered into. The transaction was still in the negotiation stage.

During the negotiations between the defendant and McCon-

nell & Smith, the defendant, through Dr. Sperti, had stated that the building was zoned so as to permit its use for offices. It was discovered later that it could not be so used, as it was then zoned. Because of that representation, Dr. Sperti felt, or at least stated that he felt, under a moral obligation to McConnell & Smith to sell the property to them for $100,000, if they desired to proceed with the purchase, notwithstanding the mistake in the use permitted as it was then zoned.

The plaintiff had nothing to do with the negotiations between defendant and McConnell & Smith. Those negotiations were conducted through another real estate broker, having no relation to the plaintiff, and were begun before the plaintiff had contacted the defendant in any way, and were continued without interruption until the final transfer of the property to McConnell & Smith.

While these negotiations were pending, the plaintiff had two separate inquiries, at different times, from two of its customers desiring to purchase property on Mt. Adams. Mr. Madden, one of its duly licensed real estate salesmen, proceeded to Mt. Adams looking for locations that would conform to his customer's specifications. He concluded that Rookwood Pottery property might satisfy his customer. However, he did not communicate with defendant in any way on this occasion. This customer, for some reason, lost interest. Later Gerson and Kuhr, the other customer, made inquiry of the plaintiff concerning Rookwood Pottery property. They had recently acquired title to the Mt. Adams Incline Plane property, adjacent to the Rookwood Pottery, and expressed a desire to purchase the latter property. It was then, for the first time, that the plaintiff informed Mr. Jansen, the defendant's business manager, that it had a customer who was interested in buying the property. Mr. Madden talked to Mr. Jansen, asking for some data concerning the property, and when he called for that sometime the latter part of November 1955, according to Mr. Jansen, he was told by him that the defendant would not sign any contract authorizing anyone to sell, that the defendant was already "dealing with another firm and there was a possible sale to them," and that "whoever sold the property would get the commission." According to Mr. Madden, Mr. Jansen told him at that time that

"there were other parties interested in the same property" and, referring to a later period, that "Mr. Jansen had been calling me, asking me to hurry *my offer* because these other people were getting closer to a deal."

The record shows that Dr. George Sperti was authorized to negotiate on behalf of defendant for the sale of the Rookwood Pottery property. No one else had that authority. On November 16, 1955, Mr. Madden visited Dr. Sperti at defendant's place of business. He told Dr. Sperti that he had customers who were desirous of buying the Rookwood property, but did not disclose their names.

The record shows that at that time (November 16, 1955) the negotiations with McConnell & Smith had progressed to the point where the parties had agreed upon the price of $100,000, and practically all the collateral provisions, and the terms reduced to writing and the writing submitted to the defendant's attorney for correction and approval. Also, by that time it had been discovered that the zoning was different from what had been represented, and that proceedings were pending by adjacent owners (Gerson and Kuhr) to change the zoning of the adjacent property, and McConnell & Smith had concluded to take the property notwithstanding the situation relating to zoning.

Mr. Madden told Dr. Sperti at that time that he was authorized by his customer to offer $100,000 for the property. In answer to that statement, Dr. Sperti said:

"'I am sorry, but there are two reasons why I couldn't accept your offer. The first one is that I believe I have a moral commitment, a verbal commitment, to sell the property; and the second is, that the commitment happens to be for that amount, so naturally I would give it to those people with whom I had been negotiating.'

"'Well,' he said, 'would you take a higher figure?'

"'Well,' I said, 'the story still remains the same. If I have a commitment and it doesn't matter what you offer me, I wouldn't be able to accept it.'"

Further along, in the same conversation, Mr. Madden asked Dr. Sperti whether he would accept $125,000 for the property, and in answer Dr. Sperti said that he would naturally pre-

fer $125,000 to $100,000, and why it would give him pleasure to deal with Mr. Madden and his customer, and then ended his statement as follows: "I wouldn't want to mislead you, so it would matter little what offer you bring me, if I have that obligation. You will just be wasting your time."

Mr. Madden testified that Dr. Sperti stated, without qualification, that he would take $125,000 for the property. He also testified that after that meeting he reported to his customer that they could obtain the property for $125,000, and they (Mr. Madden and his customer) proceeded to prepare a formal written offer of that amount on a printed form, approved by The Cincinnati Real Estate Board, which had appended to it an agreement by the seller to pay a commission of 5 per cent to the plaintiff. The provision in the writing for a commission was the first and only time that the payment of a commission was mentioned to him in any way. This document was presented at the meeting of November 19, when Mr. Madden took that offer to the defendant's place of business and there talked to Dr. Sperti. Dr. Cook of the defendant's organization was present and corroborated Dr. Sperti in all respects, as did Mr. Jansen. Mr. Madden showed the offer to Dr. Sperti. Madden's testimony is that Dr. Sperti's response was: "Well, you got what we wanted, but you got me over a barrel—I didn't think that you could have done it." Dr. Sperti did not sign the acceptance of the offer and did not sign the appended agreement to pay the commission, and, while he had it in his hand and inspected it, there is no evidence that he read it. He expressly refused to sign the writing.

Mr. Madden made another visit to defendant's place of business, when the arrangement, whereby the operation of the pottery would be continued, was discussed and, according to Mr. Madden, all details were agreed upon, but the written offer contained no provision for rent or duration of the lease. At the close of the meeting, Dr. Sperti said, "It's a deal," and shook hands with Mr. Kuhr. However, when asked to sign the agreement, Dr. Sperti said: "He couldn't do it until his attorney from New York had seen the proposition and Ok'd it." Mr. Madden testified that at no time did he mention the payment of a commission to the plaintiff for effecting a sale. Arrange-

ments were made at that meeting to meet again on January 5, 1956, in the office of defendant's attorney, manifestly for no other purpose than to continue the negotiations.

There is no evidence that the plaintiff either through Mr. Madden, or any one else, in any way mentioned the payment of a commission to it, or in any way obtained authority to find a purchaser for this property.

The meeting took place as agreed. There were present at that meeting not only representatives of Gerson and Kuhr, including Mr. Madden, but also representatives of McConnell & Smith, in addition to the defendant's representatives. It appears that the meeting with McConnell & Smith was scheduled an hour or so ahead of the meeting with Gerson and Kuhr, and the latter arrived before the McConnell & Smith meeting adjourned. However, that meeting finally adjourned, and Gerson and Kuhr were notified that the property had been sold to McConnell & Smith for $100,000. This action does not seek a commission for the sale to McConnell & Smith. The plaintiff had nothing to do with that sale. If anything, its effort was directed against that sale. This action seeks a commission for presenting Gerson and Kuhr with their offer of $125,000.

The plaintiff's action is based on contract, and the burden of proving the terms of the contract and its performance is upon it.

Shortly after the sale to McConnell & Smith, the plaintiff submitted its claim for a commission to the defendant. Upon its rejection, this action was filed.

This summary of the evidence suggests the following questions, and these questions have been briefed and argued orally:

(1) Did the defendant authorize the plaintiff, at any time, to act as its agent in securing a purchaser for the Rookwood property?

(2) Or was the plaintiff, at all times, acting for its customer desiring to buy the property?

(3) If defendant authorized the plaintiff to find a purchaser, was it conditioned upon no sale being made to McConnell & Smith?

(4) Was the agreement, if any, that only the broker who found the customer, to whom the property was sold, should earn the commission?

Upon the fourth question, we find very little direct evidence that would justify an affirmative answer, but the circumstances preclude any other conclusion.

Upon the first two questions, we believe a close analysis of the evidence requires us to find that there is no substantial evidence that defendant employed plaintiff, but that plaintiff, at all times, was acting solely for its own customer, with the hope of eventually, in some way, getting an agreement for a commission.

In the original separate finding of facts, the court found that in December, 1955, "Mr. Madden was invited and encouraged by Dr. Sperti to submit an offer for more than $100,000, but indicated that he might be morally obligated to sell to McConnell & Smith." This finding and the evidence require an affirmative answer to the third question.

The court also found that the plaintiff did, on December 29, submit an offer of $125,000 to the defendant, agreeable to all its terms, and that later the defendant sold the property to McConnell & Smith notwithstanding.

The record does not support the finding that the offer was agreeable to all the terms upon which the plaintiff was authorized to sell. There was no provision for rent or for the duration of the lease in the writing.

In response to the plaintiff's motion, the court later made additional findings that the plaintiff, between December 19, 1955, and January 4, 1956, rendered substantial service "in connection with the proposed sale" with the expectation of receiving compensation, and that defendant "availed itself of substantial services on the part of Fred'k A. Schmidt, Inc.," during that period; that the plaintiff produced a bona fide purchaser, ready, willing, and able to buy on defendant's terms; that the usual commission was 5 per cent; and that that was the reasonable value of the plaintiff's services.

It will be observed that there is no finding whatever that the *defendant* availed itself of the plaintiff's services expecting to pay therefor, or under such circumstances as would cause it, as a reasonable person, to anticipate that the plaintiff would expect compensation from it. The only relevant finding is the one already quoted. By that finding, it is established as a fact that

while Dr. Sperti encouraged Mr. Madden to submit an offer of more than $100,000, at the same time, he informed him that he might be morally obligated to sell to McConnell & Smith, to whom he actually did sell later.

The chief disputes in this case were whether the plaintiff was employed at all by the defendant and, if employed, what the terms of that employment were. The finding that omits either of these is fatally defective, and will not support the judgment.

In 4 Ohio Jurisprudence (2d), 463, Section 1119, it is said: "The statutory provision that when questions of fact are tried by the court, the court shall, upon request of one of the parties, state in writing the conclusions of fact found, separately from the conclusions of law, provided that such request is properly and timely made, confers a substantial right *and is mandatory.*"

In 12 Corpus Juris Secundum, 36, Section 14, we find this statement of the fundamental principle, that "A broker primarily is the agent of the party who first employs him." This same statement is found in 8 American Jurisprudence, 1012, Section 52.

Gerson and Kuhr first employed the plaintiff. We find no evidence of any change or extension of that relation to include an employment by defendant. There is no doubt that plaintiff was desirous of committing the defendant to the payment of a commission, but there is no evidence that defendant consented to any such commitment.

The recent case of *Bauman* v. *Worley*, 166 Ohio St., 471, 143 N. E. (2d), 820, involved some features bearing a striking resemblance to the facts in this case. As in this case, the broker was sought out by the prospective purchaser, and together they inspected many pieces of property, including that of the defendant, and eventually the prospective purchaser became the actual purchaser. The facts differ from those of the instant case in that respect. But in that case the contact of the broker with the seller was closer than in this case to the owner who was sued for a commission. The question in the case was whether the broker bore such a relation to the purchased property as to have earned the commission as against the owner. We quote from pages 473 and 474 of the opinion, to show the similarity and dissimilarity between the facts of that case and the case before us:

"With the above definition of 'procuring cause' in mind, let us examine the facts in the instant case.

"First, it was Mrs. Gfroerer herself who first discovered the property in issue. Second, Foster was engaged by Mrs. Gfroerer to assist the latter in locating a suitable home, and Foster's services were neither requested nor solicited by the defendants. Third, the most Foster was able to secure from Willard D. Worley, a defendant-owner, was an informal, oral, open or nonexclusive listing of the Bonnie Drive property at a definitely stated selling price of $27,500—an open or nonexclusive listing being one where other brokers or even the owner himself is at liberty to procure a purchaser for the property. Fourth, Foster apparently made no attempt to bring the Gfroerers and the defendants together for discussions relative to the purchase of the property at a mutually satisfactory price, nor did Foster make the defendants an offer in any amount, either orally or in writing, on behalf of the Gfroerers. Fifth, during a period in which Foster was entirely inactive with respect to the property, the Gfroerers and Willard D. Worley entered into direct negotiations for the first time, and a sale was thereupon effectuated at a price of $25,500."

At page 475, the court said: "the broker in claiming a commission for the sale of the property should at least show that he found a ready, able and willing purchaser and brought such purchaser and the owner together to *discuss* a contract of sale and purchase, *including the element of a commission for the broker.*" (Emphasis ours.)

In summary, we find that the record shows without dispute that the plaintiff, through its salesman, approached the defendant on behalf of one of its customers and offered to pay $100,000 for the Rookwood Pottery property, which defendant rejected; that then a price of $125,000 was discussed, but whether defendant said, without qualification, it would accept $125,000 is in dispute; that the plaintiff knew at that time that the defendant was negotiating with a prospective purchaser, which plaintiff later discovered was McConnell & Smith; that at no time did the plaintiff's salesman abandon his status as agent for the purchaser, or discuss in any way with defendant the subject of becoming its agent in finding a purchaser, or mention the payment of a commission to the plaintiff for finding a purchaser

until the salesman presented a written contract, reciting that the offer to sell was made through it as the seller's agent, and that the seller would be obliged to pay a commission, and this offer the defendant expressly refused to sign; and that, while there is evidence that while an understanding had been reached as to the duration of the lease and the rent, these items were not inserted in the offer which defendant was asked to sign.

By the special finding of the trial court, the plaintiff was informed in the beginning that Dr. Sperti was considering whether he was under a moral obligation to sell the Rookwood Pottery property to McConnell & Smith. Having been thus informed, the plaintiff, we find, could not reasonably expect to be paid a commission in the event of a sale to McConnell & Smith.

In conclusion, we find that there is no substantial evidence that the defendant employed the plaintiff to find a purchaser, as alleged in the petition, or in any other action on its part became bound to pay plaintiff a commission in the event of a sale to McConnell & Smith.

For these reasons, we find that the trial court erred in over-ruling the defendant's motions for an instructed verdict and for judgment in its favor.

Having reached this conclusion, this court hereby enters final judgment for the defendant.

*Judgment for defendant.*

HILDEBRANT, J., concurs.

LONG, J., dissenting. I cannot agree with the majority of my colleagues in this decision to reverse the judgment of the Common Pleas Court in this case:

It must be kept in mind that the case below was tried to the court by agreement of counsel. In other words, the court was the trier of the facts. It hears the testimony of the witnesses; it observes the decorum of the interested parties, their candor or lack thereof, and is in better position than this court to assay the probative value of that testimony. The testimony of plaintiff's witnesses is in direct conflict with that of Dr. Sperti; the trial court had the right to believe the witnesses for the plain-

tiff, which it did. It is fundamental in the law that no reviewing court has the right to substitute its judgment for that of the trier of the facts, where there is substantial evidence to sustain the judgment. In my opinion, the majority of this court is substituting its judgment for that of the trial court; it is deciding what it would have done if it had been the trial court. The majority uses this language: "We find that the record shows without dispute that plaintiff, through its salesman, approached the defendant on behalf of one of its customers and offered to pay $100,000; that then a price of $125,000 was discussed, but whether defendant said, without qualification, it would accept $125,000, *is in dispute* * * *." In such a dispute, who is better able to determine where the truth lies, this court or the trier of the facts? Let us examine the testimony as interpreted by the majority opinion. "Mr. Madden [agent of plaintiff] talked to Mr. Jansen [agent of defendant] asking for some data concerning the property and when he called for that some time the latter part of November 1955, according to Mr. Jansen, he was told by him that the defendant would not sign any contract authorizing anyone to sell; that the defendant was already 'dealing with another firm and there was a possible sale to them' and that '*whoever sold the property would get the commission.*' According to Mr. Madden, Mr. Jansen told him at that time that 'there were other parties interested in the same property' and, referring to a later period, that 'Mr. Jansen had been calling me, asking me to hurry *my offer* because these other people were getting closer to a deal.' " In addition to this, we find this statement of Madden's testimony set forth in the majority opinion, that "Dr. Sperti stated, without qualification, that he would take $125,000 for the property."

The majority, in its opinion, suggests that the evidence raises four questions:

"(1) Did the defendant authorize the plaintiff, at any time, to act as its agent in securing a purchaser for the Rookwood property?

"(2) Or was the plaintiff, at all times, acting for its customer desiring to buy the property?

"(3) If defendant authorized the plaintiff to find a purchaser, was it conditioned upon no sale being made to McConnell & Smith?

"(4) Was the agreement, if any, that only the broker who found the customer, to whom the property was sold, should earn the commission?"

In my opinion, all four of these questions can be answered by the following statement: There is substantial evidence in this record to the effect that the defendant entered into a unilateral contract by offering to pay a commission to plaintiff, if plaintiff procured a person ready, able and willing to pay on terms suitable to defendant. It isn't necessary that there be an express contract of employment in writing. If the plaintiff's agent, acting as a reasonable person, could conclude from the conduct of defendant's agents that plaintiff would be entitled to a commission, if plaintiff produced a purchaser on defendant's terms, then the defendant was making an offer, the acceptance of which would bind the defendant. In my opinion, there is substantial evidence in this record tending to prove the existence of such a unilateral contract. That is the sole question in this case. Is there, or is there not, any substantial evidence to sustain the judgment of the trial court? Let us look at the bill of exceptions. Starting with the events commencing on December 19, 1955, Madden went to Dr. Sperti's office with a written offer of $125,000. Dr. Sperti told Madden he "didn't think he could get such an offer"; Dr. Sperti's authority was stipulated. Defendant admits it would pay a commission if the property were sold on its terms. At that meeting, the terms of a lease back to Institutum Divi Thomae were agreed upon for the continuance of the Rookwood Pottery as a tenant; Dr. Sperti, Madden, and his clients and an architect went to the property between December 19 and December 29, and made plans for remodeling the property for Rookwood's occupancy; on December 29, Madden presented to Dr. Sperti a plat, the lease containing all the terms of rental of the space reserved for Rookwood; all the terms of sale were entirely satisfactory to Dr. Sperti; and so much so is this satisfaction expressed, that Dr. Sperti, according to plaintiff's witnesses, shook hands with Gerson, one of the prospective purchasers and said, "It's a deal." In pursuance of this situation, it was arranged to meet at the offices of Dr. Sperti's attorney, on January 5, 1956, to close the deal. The only purpose of this meeting was to

close the deal with plaintiff's customers. The meeting for closing was advanced to January 4, at the office of Dr. Sperti's attorney; all parties were present, as agreed upon, and, after waiting for half a day, counsel for defendant announced that the property had been sold to McConnell & Smith for $100,000, or $25,000 less than the price offered by plaintiff's clients.

In the face of this evidence, how can it be said: "there is no doubt that plaintiff was desirous of committing the defendant to the payment of a commission, *but there is no evidence* that defendant consented to any such commitment?" If there is a "dispute," as found to exist by the majority, then the finding of the trial judge is binding on this court. The trial judge properly found that "Mr. Madden was invited and encouraged by Dr. Sperti to submit an offer for more than $100,000." It makes no difference that the trial court might have improperly stated its conclusion of facts; if the judgment is supported by evidence, there can be no prejudice. *Chader* v. *Knecht,* 73 Ohio Law Abs., 134, 132 N. E. (2d), 227. In my opinion, any reasonable business man could come to no other conclusion than that, if Madden would produce a purchaser for $125,000 and an agreement with a lease back to Rookwood, the implication would follow that Dr. Sperti was free to accept such a deal and would pay a commission. 8 Ohio Jurisprudence (2d), 124, Section 48; *Suter* v. *The Farmers Fertilizer Co.,* 100 Ohio St., 403, 126 N. E., 304.

The majority cite the case of *Bauman* v. *Worley,* 166 Ohio St., 471, 143 N. E. (2d), 820, as authority in support of their decision. In that case the real estate agent was specifically employed as a broker to find a suitable home for Mrs. Gfroerer; the agent's services "were neither requested nor solicited by the defendants" (page 473 of the opinion). That is very different from the facts in the case at bar. The plaintiff's agent knew that the Rookwood property was for sale; he had a customer who was interested; the agent Madden made known to Sperti that he had such a customer, and expected to be paid a commission by defendant; and, as a matter of fact, the evidence is clear that defendant was to pay a commission to "whoever gets a purchaser, gets the commission." How can this be considered anything but an offer to pay a commission to plaintiff, if its

agent produced an able, ready, and willing buyer, agreeable to the terms of defendant? Were those terms met? Were they agreeable to defendant? Was there a meeting of the minds? All of plaintiff's witnesses testified to what Dr. Sperti said: "It's a deal." Whom should the trial court believe? It seems to me that there is more than substantial evidence in this record to prove that plaintiff's agent rendered real services for the defendant; that the defendant accepted those services, knowing that they were being rendered for defendant's benefit; and that plaintiff was relying on defendant's obligation to pay for same. In other words, the plaintiff had produced a purchaser, ready, willing, and able to buy on terms acceptable to defendant. The defendant was never under any legal obligation to sell to McConnell & Smith until after it signed the agreement with them. Where, as in the case at bar, the obligation to pay a commission was attached, the defendant, by conveying to another, cannot avoid liability to the real estate agent.

But aside from all this, I come to the real and only point for decision in this case, and that is, not would this court have decided the case as the trial court did, if it were sitting as the trier of the facts, but, is there any substantial evidence warranting the trial court in deciding the case as it did? In my opinion, there is such evidence, and the judgment should be affirmed.